**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-04837-NRN

GENE HOFFMAN; and
FIREARMS POLICY COALITION, INC.,

*Plaintiffs*,

v.

CITY AND COUNTY OF DENVER, COLORADO;
ARMANDO SALDATE III, in his official capacity as Director of the Colorado Bureau of Investigation;
COLONEL MATTHEW C. PACKARD, in his official capacity as Chief of the Colorado State Patrol;
JOHN WALSH, in his official capacity as District Attorney for the City and County of Denver, Colorado;
RON THOMAS, in his official capacity as Chief of Police for the Denver Police Department; and
ELIAS DIGGINS, in his official capacity as Sheriff of Denver,

*Defendants*.

---

**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

---

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ ii

MOTION FOR A PRELIMINARY INJUNCTION ........ 1

FACTUAL BACKGROUND ........ 2

I. The Challenged Carry Regime ........ 2

II. The Carry Regime's Effect on Plaintiffs ........ 3

LEGAL STANDARD ........ 5

ARGUMENT ........ 5

I. Plaintiffs Have a Substantial Likelihood of Success on the Merits. ........ 6

A. Under *Bruen*, the Carry Regime Is Unconstitutional Because It Imposes a Blanket Ban on Public Carry. ........ 6

B. The Textual and Historical Analysis Mandated By *Bruen* Confirms That the Carry Regime Is Unconstitutional. ........ 7

C. The Carry Regime Violates the Privileges and Immunities Clause ........ 12

II. The Remaining Factors Favor Preliminary Relief. ........ 14

III. The Court Should Waive Bond Under Rule 65(c). ........ 15

CONCLUSION ........ 15

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Awad v. Ziriax*,
670 F.3d 1111 (10th Cir. 2012) ....................................................................................14

*Cal. Rifle & Pistol Ass'n v. L.A. Cnty. Sheriff's Dep't*,
745 F. Supp. 3d 1037 (C.D. Cal. 2024) ......................................................................10

*Coquina Oil Corp. v. Transwestern Pipeline Co.*,
825 F.2d 1461 (10th Cir. 1987) ....................................................................................15

*Corfield v. Coryell*,
6 F. Cas. 546 (C.C.E.D. Pa. 1823) (No. 3,230) ..........................................................13

*District of Columbia v. Heller*,
554 U.S. 570 (2008)........................................................................................................6

*Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*,
269 F.3d 1149 (10th Cir. 2001) ....................................................................................15

*Elrod v. Burns*,
427 U.S. 347 (1976)..............................................................................................14, 15

*Higbie v. James*,
795 F. Supp. 3d 307 (N.D.N.Y. 2025)...................................................................9, 10

*Hoffman v. Bonta*,
789 F. Supp. 3d 995 (S.D. Cal. 2025)..........................................................................10

*McDonald v. City of Chicago*,
561 U.S. 742 (2010)..................................................................................................6, 13

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. 1 (2022)...............................................................1, 5, 6, 7, 8, 9, 11, 12, 13

*NetChoice, LLC v. Reyes*,
748 F. Supp. 3d 1105 (D. Utah 2024)..........................................................................15

*Ortega v. Grisham*,
148 F.4th 1134 (10th Cir. 2025) ...................................................................5, 8, 14, 15

*Peterson v. Martinez*,
707 F.3d 1197 (10th Cir. 2013) ......................................................................11, 13, 14

*Rocky Mountain Gun Owners v. Polis*,
685 F. Supp. 3d 1033 (D. Colo. 2023)........................................................................15

*Rocky Mountain Gun Owners v. Polis*,
121 F.4th 96 (10th Cir. 2024) .......................................................................................15

*Saenz v. Roe*,
526 U.S. 489 (1999)......................................................................................................12

*Smith v. State*,
50 Tenn. 511 (1872)......................................................................................................10

*Toomer v. Witsell*,
334 U.S. 385 (1948)....................2, 12, 14

*Wolford v. Lopez*,
609 U.S. 185 (2026)....................6, 7, 8

**Statutes and Codes**

U.S. CONST. art. IV, § 2, cl. 1 ....................12

U.S. CONST. amend. II ....................6

18 U.S.C.
§ 922(q)(2)(A)....................3, 11
§ 922(q)(2)(B)....................3, 11

COLO. REV. STAT.
§ 18-12-105(2)(c)....................2
§ 18-12-105.3(2)(e)....................3, 11
§ 18-12-105.5(3)(d.5)(II) ....................3, 11
§ 18-12-203(1)(a)....................2
§ 18-12-213(1) ....................2

Denv., Colo., Rev. Mun. Code ch. 38, art. IV, div. 2,
§ 38-118(a)....................3
§ 38-118(b)....................3
§ 38-118(d)....................3

**Other Authorities**

ACTS FOR THE COMMONWEALTH OF KENTUCKY (Frankfort, Gerard & Berry 1813)....................10

1 JOHN RUSSELL BARTLETT, RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND (Providence, A. Crawford Greene and Brother 1856) (1636–1663)....................9

3 WILLIAM HAND BROWNE, ARCHIVES OF MARYLAND (Balt., Maryland Historical Society 1885) (1636–1667)....................9, 10

*Concealed Handgun Permit (CHP) Reciprocity*, COLO. BUREAU OF INVESTIGATION, https://perma.cc/4YY-P ....................3

1 WILLIAM WALLER HENING, LAWS OF VIRGINIA (N.Y.C., R. & W. & G. Bartow 1823) (1619)...9

AARON LEAMING & JACOB SPICER, NEW JERSEY ACTS (Phila., W. Bradford 1881)....................10

1 NATHANIEL B. SHURTLEFF, RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY (Bos., William White 1853) (1628–1641) ....................9

**MOTION FOR PRELIMINARY INJUNCTION**

The Second and Fourteenth Amendments protect the right of law-abiding citizens to carry a handgun in public for self-defense. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 10 (2022). The combined effect of the Colorado and Denver laws challenged here, however, is to flatly prohibit an entire class of law-abiding citizens from exercising that right because they do not live in Colorado. Under *Bruen*, that is unacceptable.

Under Colorado law, it is generally lawful for an adult to carry a firearm openly on his person, but to carry a concealed firearm requires a permit, either one granted by the State to its residents, or for non-residents, by their home state if that state has reciprocity with Colorado. But for individuals, such as Plaintiff Gene Hoffman, who reside out of State in a state that does not recognize Colorado permits, no option is available.

To be clear, this is not a case about concealed carry. Rather, there are certain circumstances in Colorado where the lack of a license means a person cannot carry in *any* manner. That is the situation, for example, in Denver where a local ordinance outright prohibits all persons from openly carrying a firearm within city and county limits. As a result, people like Hoffman who can only carry openly, have *no* lawful means to publicly carry a handgun while in Denver. Moreover, the federal Gun Free School Zones Act, which bars carriage within 1,000 feet of any school in the State for persons who do not possess a Colorado carry permit, turns the rest of the State into a patchwork of prohibited zones where carry is likewise effectively banned for individuals like Hoffman. Finally, Colorado denies these individuals the ability to carry in certain areas that require a carry permit, such as the parking area of public universities.

After *Bruen*, it is beyond cavil that States cannot create licensing regimes that close off all paths to public carry for ordinary, law-abiding adult citizens. But if more were somehow needed

to resolve this case, the textual and historical analysis required by *Bruen* leads to the same result. The proscribed conduct—carrying a handgun publicly for self-defense—falls squarely within the Second Amendment's plain text, and nothing in the Nation's history supports stripping citizens of their right to carry based on where they live. Because the provisions challenged here rest on the premise that nonresidents have no right to carry a handgun for self-defense while in Denver and myriad other places throughout the State they violate the Second and Fourteenth Amendments.

Moreover, by denying Hoffman and other nonresidents, including FPC's similarly situated members, the ability to acquire carry licenses from Colorado and carry on equal footing with residents of the State, Colorado's licensing restrictions also violate the Privileges and Immunities Clause of the Constitution, which, at bottom, "insure[s] to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy." *Toomer v. Witsell*, 334 U.S. 385, 395 (1948). Plaintiffs therefore move, for the reasons laid out below, the Court for a preliminary injunction under Rule 65(a), enjoining Defendants to permit Plaintiff Hoffman and all nonresidents, including Plaintiff FPC's similarly situated members, to lawfully exercise their constitutionally protected right to bear arms.

## FACTUAL BACKGROUND

### I. The Challenged Carry Regime

Colorado state law distinguishes between concealed and open carry. Those wishing to carry a firearm concealed in Colorado must hold a valid concealed-carry permit. *See* COLO. REV. STAT. § 18-12-105(2)(c). To obtain a Colorado-issued permit, a person must (among other things) be "a legal resident of the state of Colorado." *Id.* § 18-12-203(1)(a). For nonresidents, Colorado will recognize as valid concealed-carry permits issued by a person's State of residence if, and only if, that State also "recognizes the validity of" Colorado's permits. *Id.* § 18-12-213(1). Colorado lacks

reciprocity with 15 States, including California, so residents of those States cannot carry concealed while in Colorado. *See Concealed Handgun Permit (CHP) Reciprocity*, Colo. Bureau of Investigation, https://perma.cc/4YYV-PEGM.

Although state law leaves such individuals the option to carry openly in some circumstances, that option is illusory in many parts of the State. Most straightforwardly, the City and County of Denver eliminates that option within its jurisdiction by making it "unlawful for any person to openly wear, carry, or transport any weapon on or about their person or vehicle." Denv., Colo., Rev. Mun. Code ch. 38, art. IV, div. 2, § 38-118(b). It also prohibits concealed carry unless "the person holds a valid permit to carry a concealed handgun and the person is carrying the handgun in conformance with any applicable federal, state, or local law." *Id.* § 38-118(a), (d). The upshot of this carry regime is that nonresidents whose home States lack reciprocity with Colorado have *no* lawful means of carrying a handgun in public while in Denver—Colorado takes concealed carry off the table, and Denver does the same for open carry.

But that is not all. Because the federal Gun Free School Zones Act ("GFSZA") bars carrying a firearm within 1,000 feet of a school unless a person holds a carry license from the State in which the school is located, *see* 18 U.S.C. § 922(q)(2)(A)–(B), Colorado, by refusing to issue carry permits to nonresidents, effectively disarms them across vast swaths of the State. It also denies them certain privileges available under state law for those with carry permits, such as the ability to possess a handgun in the parking areas of public universities and certain government buildings. *See* COLO. REV. STAT. §§ 18-12-105.3(2)(e), 18-12-105.5(3)(d.5)(II). So the challenged carry regime's blanket ban on public carry is not confined to Denver—it spans areas across the entire State.

## II. The Carry Regime's Effect on Plaintiffs

Gene Hoffman is a law-abiding and responsible adult resident of California. Declaration of Gene Hoffman ¶ 1. Hoffman possesses a concealed-carry permit from his home State of California as well as several others. *Id.* ¶ 4. He routinely carries a handgun for self-defense, both in California and when he travels out of State, when he can do so in compliance with federal, state, and local law. *Id.* ¶ 5. He regularly travels to Denver and spends time in public areas and establishments within city and county limits. *Id.* ¶ 6. His son is enrolled at Colorado State University in Fort Collins, and Hoffman visits him two or three times per year. *Id.* During these trips he travels into and out of the State through Denver and often stays in Denver with friends who live in the city. *Id.* Plaintiff Hoffman most recently visited Denver in May 2026, and he has concrete plans to return in January 2027. *Id.* ¶ 7.

Given Denver's ban on open carry and the lack of concealed-carry reciprocity between Colorado and California, Hoffman may not lawfully carry a handgun in public while in Denver. *Id.* ¶¶ 8–10. Nor may he possess a handgun in the parking areas of Colorado State University or certain government buildings. *Id.* ¶ 9. And because Colorado will not issue him a carry permit, Hoffman risks violating the GFSZA any time he carries in Colorado, given the many, overlapping school zones throughout the State. *Id.* Hoffman is willing and able to complete all the steps necessary under Colorado law to obtain a concealed-carry permit from the State; nothing but the fact that he is not a Colorado resident makes him ineligible for one, and if it were not for Colorado's refusal to grant permits to nonresidents, he would apply for a permit and carry when in Denver and in Colorado more generally. *Id.* ¶ 11.

Plaintiff FPC is a nonprofit membership organization that seeks to create a world of maximal human liberty and freedom, including by defending and advancing the inalienable, fundamental, and individual right to keep and bear arms. Declaration of Brandon Combs ¶¶ 2–4.

Protecting the right to carry for nonresidents is especially important to FPC and its mission, and FPC has litigated to secure that right in California, New York, and Louisiana. *Id.* ¶ 6. FPC brings this action on behalf of its members, including Plaintiff Hoffman and others who reside outside Colorado and who intend and desire to exercise their constitutional right to bear arms in Denver and other areas throughout the State. *Id.* ¶ 7–9.

## LEGAL STANDARD

To obtain a preliminary injunction, plaintiffs must show "(1) a substantial likelihood that they will ultimately succeed on the merits of their suit; (2) that they are likely to suffer irreparable harm without preliminary relief; (3) this threatened harm outweighs the harm a preliminary injunction may pose to the opposing party; and, (4) if issued, the injunction will not adversely affect the public interest." *Ortega v. Grisham*, 148 F.4th 1134, 1141–42 (10th Cir. 2025). Courts "presume" irreparable harm when the injury stems from "a violated constitutional right," which "collapses the first and second preliminary-injunction factors." *Id.* (cleaned up). Similarly, when the government is a party, "the third and fourth factors merge." *Id.* (cleaned up).

## ARGUMENT

In *Bruen*, the Supreme Court held that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." 597 U.S. at 10. That resolves this motion (and this case). But even if *Bruen*'s bottom-line holding somehow failed to reach public carry outside one's State of residence—an untenable reading given that the Second Amendment has the same meaning in all 50 States—*Bruen*'s two-step framework for analyzing Second Amendment challenges leads to the same outcome. In short, *Bruen* establishes that the public carry of handguns is protected by the Second Amendment's plain text, so Defendants must show that a blanket ban on public carry for nonresidents is consistent with the Nation's historical

tradition of firearm regulation. Because Defendants cannot meet that burden, Colorado and Denver's carry regime violates the Second and Fourteenth Amendments. Colorado also violates the Privileges and Immunities Clause of Article IV of the Constitution by denying nonresidents the same rights and privileges available to residents. The Court should grant the motion for a preliminary injunction.

## I. Plaintiffs Have a Substantial Likelihood of Success on the Merits.

### A. Under *Bruen*, the Carry Regime Is Unconstitutional Because It Imposes a Blanket Ban on Public Carry.

The Second Amendment to the United States Constitution, which is fully applicable to the States through the Fourteenth Amendment, provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed." U.S. CONST. amend. II. The Supreme Court has recognized "the right to keep and bear arms" as "among those fundamental rights necessary to our system of ordered liberty." *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010). In guaranteeing that right, the Second Amendment "codified a *pre-existing* right," and today carries the same "scope" it was "understood to have when the people adopted" it. *District of Columbia v. Heller*, 554 U.S. 570, 592, 634–35 (2008).

In *Bruen*, the Supreme Court considered a Second Amendment challenge to a state licensing scheme that prohibited public carry unless a person could show a "special need" for a carry permit. 597 U.S. at 11–13. After examining the text of the Second Amendment and the Nation's historical tradition of firearm regulation, the Supreme Court held that the Constitution protects the "right to bear arms in public for self-defense." *Id.* at 70. States and localities therefore may not "prevent[] law-abiding citizens with ordinary self-defense needs from" carrying a handgun in public. *Id.* at 71. Any law—or combination of laws—that "broadly prohibit[s] law-abiding citizens from carrying commonly used firearms in public for self-defense" is

unconstitutional. *Wolford v. Lopez*, 609 U.S. 185, 197 (2026); *Bruen*, 597 U.S. at 11.

The laws challenged here work to impose a flat ban on public carry for an entire class of law-abiding citizens, with no exceptions, in Denver and other areas throughout the State. The carry regime therefore violates *Bruen*'s core holding and can be enjoined without the need for any further analysis. It makes no difference that those affected by the ban live outside Colorado—the Supreme Court in *Bruen* recognized a right to public carry, not a right to public carry *only* in one's State of residence. Because Colorado and Denver's carry regime wrongly assumes that the Second Amendment goes on leave when a person visits another State, it violates the Constitution.

### B. The Textual and Historical Analysis Mandated By *Bruen* Confirms That the Carry Regime Is Unconstitutional.

Plaintiffs' substantial likelihood of success is evident before one even gets to the textual and historical analysis required by *Bruen*. But even if this Court decides to conduct that analysis, the text and history of the Second Amendment only confirm that nonresidents of a city or State have a constitutionally protected right to carry firearms in public for self-defense, just as residents do.

**1.** *Bruen* establishes a two-step framework for analyzing Second Amendment challenges. First, the court must determine whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 24. If it does, then "the Constitution presumptively protects that conduct." *Id.* At the second step, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* (quotation marks omitted).

Applying the *Bruen* framework makes clear that Colorado and Denver's attempt to graft a residency requirement onto the Second Amendment is both atextual and ahistorical. Starting with

the textual analysis, the Supreme Court has summarized this step as encompassing "three subsidiary questions": (1) "does the law apply to 'the people,' " (2) "does it concern any form of 'Arms,' " and (3) "does the law place any restrictions on either the 'keep[ing] . . . or the 'bear[ing]' " of them? *Wolford*, 609 U.S. at 195. The answers to these questions are the same here as they were in *Bruen*: Hoffman, representative of all similarly situated non-Colorado residents, is an "ordinary, law-abiding, adult citizen" and hence part of "the people"; the handgun he wishes to carry is the same type of "Arm" that the plaintiffs in *Bruen* wished to carry; and the challenged laws directly restrict his "bear[ing]" of the handgun by providing him no legal way to carry it throughout Colorado, including in the City and County of Denver and on public university campuses. *Bruen*, 597 U.S. at 31–33. Colorado and Denver's ban on public carry for nonresidents is thus "presumptively unconstitutional." *Wolford*, 609 U.S. at 196.

To justify the ban, Defendants must show that it is consistent with the Nation's historical tradition of firearm regulation. *Bruen*, 597 U.S. at 29–30, 37–38. To do so, Defendants must point to "historical laws that pursued an analogous goal in an analogous way." *Wolford*, 609 U.S. at 216 (Barrett, J., concurring). "An outlier legal rule adopted in a few locales is not enough," *id.* at 207, nor are rules adopted outside the relevant point in time, *see Bruen*, 597 U.S. at 37–38, 66 & n.28; *Ortega*, 148 F.4th at 1146 n.6. And "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26.

Defendants cannot carry this burden. As *Bruen* observed after canvassing the Nation's history, "American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense." *Id.* at 70. And when States did restrict the right to bear arms,

"[t]hose restrictions . . . limited the intent for which one could carry arms, the manner by which one carried arms, or the exceptional circumstances under which one could not carry arms, such as before justices of the peace and other government officials." *Id.* None of these categories supports Colorado and Denver's blanket ban on public carry by nonresidents.

In short, the Nation's historical tradition does *not* support laws prohibiting otherwise-qualified nonresidents from carrying firearms in public for self-defense—even though interstate travel of persons with firearms is nothing new. *See Bruen*, 597 U.S. at 26. Indeed, far from *supporting* such restrictions, the Nation's historical tradition squarely *rejects* them in favor of a "general right to publicly carry arms for self-defense outside the home which, during an individual's daily life, can include crossing state lines." *Higbie v. James*, 795 F. Supp. 3d 307, 342 (N.D.N.Y. 2025) (cleaned up). Although the burden falls on *Defendants* to identify an analogous tradition of *restricting* the right—not on *Plaintiffs* to identify one *upholding* it—this history demonstrates why Defendants cannot meet their burden.

During the Colonial period, at least four colonies *required* persons traveling to carry arms with them for their safety, reflecting the heightened danger presented by travel. *See* Am. Compl. ¶ 39. For example, a 1639 Rhode Island law provided: "It is ordered, that noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword[.]" 1 JOHN RUSSELL BARTLETT, RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND 94 (Providence, A. Crawford Greene and Brother 1856) (1636–1663); *see also* 1 WILLIAM WALLER HENING, LAWS OF VIRGINIA 127, 198 (N.Y.C., R. & W. & G. Bartow 1823) (1619) (mandating that "no man go or send abroad without sufficient partie will armed" or "worke in the ground without their arms"); 1 NATHANIEL B. SHURTLEFF, RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY 190 (Bos., William White 1853) (1628–1641); 3

WILLIAM HAND BROWNE, ARCHIVES OF MARYLAND 103 (Balt., Maryland Historical Society 1885) (1636–1667). What is more, there is a longstanding historical tradition—stretching from before the Founding until after Reconstruction—of traveler exceptions to carry restrictions that otherwise applied. *See* Am. Compl. ¶¶ 40–44; AARON LEAMING & JACOB SPICER, NEW JERSEY ACTS 290 (Phila., W. Bradford 1881) (An Act Against Wearing Swords, ch. 9, N.J. Stat. (1686)); ACTS FOR THE COMMONWEALTH OF KENTUCKY 100–01 (Frankfort, Gerard & Berry 1813). By the end of the Antebellum Era, other States had codified similar exceptions for travelers, *see* Am. Compl. ¶ 41, and the tradition continued well past the Civil War, *see id.* ¶ 42; *see also Smith v. State*, 50 Tenn. 511, 511 (1872) (citing 1870 Tennessee statute that prohibited carrying a pistol but exempted "persons who are on a journey out of their State or county"). Even local governments recognized a traveler exception to carry laws. *See* Am. Compl. ¶ 43.

Again, under *Bruen*, Defendants bear the burden of identifying historical analogues that show a tradition of regulation. The above history shows they will not be able to do so because history reflects exactly the opposite tradition: one of nonresidents (or travelers) enjoying *more* leeway to carry arms, not less. No surprise, then, that federal courts have recently enjoined nonresident carry bans in California and New York. *See Hoffman v. Bonta*, 789 F. Supp. 3d 995, 1002–03 (S.D. Cal. 2025) (noting history of "traveler exceptions" to carry laws); *Cal. Rifle & Pistol Ass'n, Inc. v. L.A. Cnty. Sheriff's Dep't*, 745 F. Supp. 3d 1037, 1065–66 (C.D. Cal. 2024) (noting traveler exceptions to carry laws and explaining that the State failed to "identify[] any similar laws before *either* the Founding or Reconstruction"); *Higbie*, 795 F. Supp. 3d at 340–41 (recognizing "the lack of supportive historical tradition for restricting firearm licenses to out-of-state residents" and thereby denying them the ability to carry a firearm in public). Insofar as Defendants argue that a blanket carry ban is permissible in school zones and in the parking areas

of public universities and government buildings, such contention is undermined by the ability of *residents* to carry in these areas with a permit. *See* 18 U.S.C. § 922(q)(2)(A)–(B); COLO. REV. STAT. §§ 18-12-105.3(2)(e), 18-12-105.5(3)(d.5)(II). There is no historical basis for denying nonresidents that same right. In sum, because Colorado and Denver's nonresident carry ban is unsupported by our historical tradition, it violates the Second and Fourteenth Amendments.

**2.** None of the above is inconsistent with the Tenth Circuit's pre-*Bruen* decision in *Peterson v. Martinez*, 707 F.3d 1197 (10th Cir. 2013). For one thing, although the nonresident plaintiff in that case alleged (like the Plaintiffs here) that he was "completely disarmed" in Denver, the plaintiff "made a conscious decision not to challenge the constitutionality of the Denver ordinance" but only the Colorado statute that denied him the ability to obtain a carry permit. *Id.* at 1208 (noting that the plaintiff "clearly waived" any challenge to the Denver ordinance banning open carry). As the court noted, "[w]e see no reason that a plaintiff could not challenge both the [Colorado] statute and the [Denver] ordinance in the same suit." *Id.* This suit presents precisely that challenge. *See* Am. Compl. ¶¶ 5, 65(a)–(b) (challenging the combined effect of the statute and the ordinance).

As for *Peterson*'s holding that "the carrying of concealed firearms is not protected by the Second Amendment," 707 F.3d at 1201, this suit does nothing to disturb that holding. Unlike in *Peterson*, Plaintiffs here are not arguing that Colorado's refusal to grant concealed-carry permits to nonresidents, in isolation, violates the Second Amendment. *Cf. id.* at 1209 ("Peterson seeks a ruling that Colorado may not restrict [concealed-carry licenses] to residents of the state."). Rather, the violation here stems from the fact that in various places throughout Colorado—in Denver, within 1,000 feet of schools, and in the parking area of public universities and certain government buildings—there is a "ban [on] public carry altogether" for many nonresidents, including Hoffman and similarly situated FPC members. *Bruen*, 597 U.S. at 53.

Put differently, *Peterson* was about the mode of carriage; this case is about whether Plaintiffs and all similarly situated nonresidents can carry *at all*. And because *open carry* is already prohibited in the places noted above, the simplest and most complete form of relief would be to permit nonresidents to apply for and obtain *concealed-carry* licenses from the State, which is the exact same relief available to residents. But the Second Amendment violation could also be redressed, in part, by any form of relief that allows Plaintiffs to exercise their constitutionally protected right to carry in public.

The Second Amendment does not enshrine "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 597 U.S. at 70 (cleaned up). Imagine a state law that barred nonresidents from participating in a local protest. Or suppose a State denied nonresidents the ability to be baptized in a local church. Nobody would seriously contend that citizens give up their First Amendment protected rights to free speech and free exercise when they cross State lines. The same goes for the right to bear arms.

**C. The Carry Regime Violates the Privileges and Immunities Clause.**

Colorado's carry regime also violates the Privileges and Immunities Clause, which provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. CONST. art. IV, § 2, cl. 1. The Privileges and Immunities Clause "was designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy" and thus bars "discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States." *Toomer*, 334 U.S. at 395–96; *see also Saenz v. Roe*, 526 U.S. 489, 501 (1999) (explaining that the Clause "removes 'from the citizens of each State the disabilities of alienage in the other States'" (quoting *Paul v. Virginia*, 75 U.S. 168, 180 (1868))).

Courts apply "a two-prong test to determine whether a statute violates the Privileges and Immunities Clause." *Peterson*, 707 F.3d at 1213. "First, a court asks whether the restricted activity is 'sufficiently basic to the livelihood of the Nation . . . as to fall within the purview of the Privileges and Immunities Clause.'" *Id.* (quoting *Sup. Ct. of Va. v. Friedman*, 487 U.S. 59, 64–65 (1988)). " 'Second, if the challenged restriction deprives nonresidents of a protected privilege,' " it is invalid if it " 'is not closely related to the advancement of a substantial state interest.' " *Id.* at 1213–14 (quoting *Friedman*, 487 U.S. at 65). The challenged carry regime flunks both prongs.

*First*, the right to bear arms for self-defense is a privilege that "fall[s] within the purview of the Privileges and Immunities Clause." *Id.* at 1213 (cleaned up); *see McDonald*, 561 U.S. at 850–53 (Thomas, J., concurring in part). Justice Bushrod Washington, sitting as a Circuit Justice in *Corfield v. Coryell*, famously wrote that the "privileges and immunities" protected by Article IV, § 2, are those rights "which are, in their nature, fundamental; which belong, of right, to the citizens of all free governments; and which have, at all times, been enjoyed by the citizens of the several states which compose this Union, from the time of their becoming free, independent, and sovereign." 6 F. Cas. 546, 551–52 (C.C.E.D. Pa. 1823) (No. 3,230). As the Supreme Court later recognized, "the right to keep and bear arms" is "among those fundamental rights necessary to our system of ordered liberty." *McDonald*, 561 U.S. at 778. That is why, "American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense." *Bruen*, 597 U.S. at 70; *see supra* Part I.B; *see also Peterson*, 707 F.3d at 1214.

*Peterson*'s holding that *concealed carry* is not a privilege protected under Article IV, § 2, "does not conflict with this line of analysis." 707 F.3d at 1216 & n.8. To the contrary, *Peterson* reinforces the view that public carry is covered by the Privileges and Immunities Clause, because the court recognized that the Clause is not confined to economic activities but extends to any

activity that is "sufficiently basic to the livelihood of the Nation." *Id.* at 1214–15 (quoting *Friedman*, 487 U.S. at 64). *Peterson* even went out of its way to make clear that, despite its holding as to concealed carry, "the right to keep and bear arms may qualify as a privilege protected under Article IV." 707 F.3d at 1216 n.8.

*Second*, the total ban on public carry for nonresidents in many parts of the State "is not closely related to the advancement of a substantial state interest." *Id.* at 1213–14. Far from advancing a *substantial* state interest, Defendants have *no* interest in denying nonresidents the ability to carry a handgun publicly for self-defense. They certainly cannot point to anything "indicat[ing] that non-citizens constitute a peculiar source of the evil at which the statute is aimed." *Toomer*, 334 U.S. at 398. After all, nonresidents *can* carry publicly in many parts of the State, including Denver so long as their home States have concealed-carry reciprocity with Colorado. That fact refutes any interest in denying the same right to Hoffman and similarly situated individuals, including FPC's members. The privilege is not available to them for no reason "beyond the mere fact that they are citizens of other States" that happen to lack reciprocity, which says nothing about their fitness to bear arms. *Id.* at 396. Accordingly, the ban on public carry violates the Privileges and Immunities Clause.

## II. The Remaining Factors Favor Preliminary Relief.

Plaintiffs' substantial likelihood of success on the merits controls the entire preliminary-injunction analysis. Because Plaintiffs' injuries arise from the violation of their constitutionally protected rights, their injuries are irreparable, *see Ortega*, 148 F.4th at 1142, and "no further showing of irreparable injury is necessary," *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012) (cleaned up); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) (holding that the deprivation of constitutional rights, "for even minimal periods of time, unquestionably constitutes

irreparable injury"). More, the balance of harms and public interest—which merge here—strongly support preliminary relief because "it is always in the public interest to prevent the violation of a party's constitutional rights." *Ortega*, 148 F.4th at 1154 n.13 (cleaned up); *see also id.* (explaining that "when a constitutional right hangs in the balance, even a temporary loss usually trumps any harm to the defendant" (cleaned up)). The Court should grant the motion.

## III. The Court Should Waive Bond Under Rule 65(c).

Under Federal Rule of Civil Procedure 65(c), district courts enjoy "wide discretion in setting the amount of the preliminary injunction bond." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1158 (10th Cir. 2001) (cleaned up). Courts may "determine a bond is unnecessary . . . if there is an absence of proof showing a likelihood of harm" to the non-moving party. *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987) (cleaned up). And when a "preliminary injunction enforces fundamental constitutional rights against the government . . ., waiving the security requirement best accomplishes the purposes of Rule 65(c)." *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105, 1132 (D. Utah 2024) (cleaned up); *see also Rocky Mountain Gun Owners v. Polis*, 685 F. Supp. 3d 1033, 1061 (D. Colo. 2023), *rev'd and remanded*, 121 F.4th 96 (10th Cir. 2024). Because the requested preliminary relief would vindicate Plaintiffs' fundamental constitutionally protected rights, the Court should not require a bond.

## CONCLUSION

The Court should enjoin Defendants from enforcing Colorado and Denver's unconstitutional carry regime against nonresidents, including Plaintiff Hoffman and Plaintiff FPC's nonresident members and order Defendants to grant carry licenses to nonresidents, including Plaintiff Hoffman and Plaintiff FPC's nonresident members.

Dated: October 7, 2026

Respectfully submitted,

*/s/ David H. Thompson*
David H. Thompson
Peter A. Patterson
William V. Bergstrom
Riley W. Walters
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com
rwalters@cooperkirk.com

*Counsel for Plaintiffs*

## RULE 7.1 CERTIFICATION

I hereby certify that prior to filing this motion, counsel for Plaintiffs conferred with counsel for all defendants in this case, including those who have not yet appeared. All defendants oppose this motion.

*/s/ David H. Thompson*
David H. Thompson
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of October, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system. I hereby certify that I have served the foregoing document or paper to the following non-CM/ECF participants via FedEx.

Armando Saldate III
Director of the Colorado Bureau of Investigation
690 Kipling Street, Suite 3000
Lakewood, CO 80215

Colonel Matthew C. Packard
Chief of the Colorado State Patrol
700 Kipling St.
Lakewood, CO 80215

John Walsh
Denver District Attorney
310 17th St.
Suite 5300
Denver, CO 80202

*/s/ David H. Thompson*
David H. Thompson

*Counsel for Plaintiffs*