**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:26-cv-04837-PAB

GENE HOFFMAN; and
FIREARMS POLICY COALITION, INC.,

*Plaintiffs*,

v.

CITY AND COUNTY OF DENVER, COLORADO;
ARMANDO SALDATE III, in his official capacity as Director of the Colorado Bureau of Investigation;
COLONEL MATTHEW C. PACKARD, in his official capacity as Chief of the Colorado State Patrol;
JOHN WALSH, in his official capacity as District Attorney for the City and County of Denver, Colorado;
RON THOMAS, in his official capacity as Chief of Police for the Denver Police Department; and
ELIAS DIGGINS, in his official capacity as Sheriff of Denver,

*Defendants*.

---

**PLAINTIFFS' REPLY IN SUPPORT OF**
**MOTION FOR A PRELIMINARY INJUNCTION**

---

In response to Plaintiffs' motion for a preliminary injunction, Defendants play the blame game. The State Defendants—District Attorney Walsh, Director Saldate, and Colonel Packard—blame Denver for the challenged ban on public carry, arguing that Colorado law generally allows persons, including nonresidents, to carry *openly* within the State. *See, e.g.*, Walsh Resp. at 6, ECF 35 (arguing that "DA Walsh only enforces Colorado state law" and "Hoffman may legally open carry under Colorado law"); Saldate & Packard Resp. at 5, ECF 37 (arguing that "Plaintiffs'

alleged inability to carry firearms in Denver is a matter of local government law"). Meanwhile, the Denver Defendants—the City, Chief Thomas, and Sheriff Diggins—deflect blame back onto the State, arguing that Denver generally allows *concealed* carry, including for nonresidents. *See, e.g.*, Denver Resp. at 1, 6, ECF 34 (arguing that Denver allows concealed carry by anyone who "holds a valid permit"). According to Defendants, although the overlap of laws results in an effective carry ban for people like Hoffman, because neither Colorado nor Denver law, in isolation, is entirely responsible for his injury, he can get no redress.

If Defendants were right, then states and localities could divide and conquer the right to keep and bear arms; one jurisdiction could ban concealed carry, the other open carry, and each would point to the other when sued. Defendants' position, in other words, "would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 31 (2022).

Defendants ignore what this suit is about: State and local laws are working *together* to deny an entire class of law-abiding citizens the right to carry a handgun in public for self-defense. *Bruen* forecloses that result. And although Defendants try to isolate Colorado's restrictions on concealed carry from Denver's ban on open carry, the Tenth Circuit invited precisely this type of challenge—that is, to the *combined effect* of these very laws—when it recognized that a person may "challenge both the [Colorado] statute and the [Denver] ordinance in the same suit." *Peterson v. Martinez*, 707 F.3d 1197, 1208 (10th Cir. 2013).

Most of Defendants' arguments—including their entire *Bruen* analysis—therefore fail to clear the starting blocks, because they address each law individually. Indeed, Defendants invoke *Bruen*'s language that a government may eliminate one manner of public carry "so long as [it]

le[aves] open" the other. 597 U.S. at 59. But none explains how a regime that eliminates both—as this one does—could survive. Their only recourse, then, is to deny the existence of such a prohibition.

Their attempt to do so falls flat. Hoffman's carry permits are not "valid" in Colorado, so Denver's allowance of concealed carry does not help him. And the supposed option to seek "authorization from the city" for open carry is pure fiction—there is no application process, no criteria, and no record of it ever having been used. Even if it existed, a standardless permission slip could not survive *Bruen*.

For these reasons, and the ones that follow, the Court should grant Plaintiffs' motion and preliminarily enjoin Defendants from enforcing Colorado and Denver law, in conjunction with one another, against Hoffman and Firearms Policy Coalition's ("FPC") similarly situated members. Complete relief also requires that they be permitted to obtain Colorado permits on the same terms as residents, and that Colorado recognize their out-of-state permits, because the State's refusal to do so disarms them in many places outside Denver as well.[1]

## ARGUMENT

### I. Plaintiffs Are Likely to Succeed on the Merits of Both Claims.

Defendants do not dispute that the Constitution protects the right of law-abiding citizens to carry a handgun in public for self-defense. *Id.* at 10. Nor do they dispute that the right does not end at state lines; it extends to residents and nonresidents alike. That is enough to resolve this

[1] Plaintiffs consolidate their replies to Defendants' three separate filings in this single brief.

motion (and this case), because the combined effect of Colorado and Denver law denies nonresidents like Hoffman *any* lawful means to carry a handgun publicly while in Denver.

Defendants resist this inescapable result on two principal grounds. First, they isolate Colorado's concealed-carry restrictions (and the Defendants that enforce them) from Denver's ban on open carry, then defend each law individually while ignoring the combined effect. Second, they claim that Denver already allows Hoffman to carry both concealed *and* openly. Neither argument has any merit.

**A. Plaintiffs challenge the combined effect of Colorado and Denver law.**

Plaintiffs' claims target the disarmament that results from Colorado and Denver law operating together. That is a familiar mode of analysis. In *Heller*, no single provision banned handguns: one made it a crime to possess an unregistered firearm, and another prohibited registering handguns. The Court treated the two together as a handgun ban. *District of Columbia v. Heller*, 554 U.S. 570, 574–75, 628–29 (2008). And when it comes to the combined effect of Colorado and Denver law specifically, *Peterson* went out of its way to recognize that a plaintiff could "challenge both the statute and the ordinance in the same suit." 707 F.3d at 1208. This suit is exactly what *Peterson* contemplated.

Defendants therefore joust with a strawman for most of their briefing. Walsh argues that Hoffman is not injured by *Colorado's* public-carry regulations because they allow him to carry openly. *See* Walsh Resp. at 6–7. He also contends that *Colorado* law is consistent with *Bruen*'s statement that states may "lawfully eliminate one kind of public carry—concealed carry—so long as they le[ave] open the option to carry openly." *Id.* at 10 (quoting *Bruen*, 597 U.S. at 59). Saldate and Packard take a similar tack, asserting that Plaintiffs have "fail[ed] to identify *any*

unconstitutional aspect of *Colorado* law," and that the "inability to carry firearms in Denver is a matter of local government law." Saldate & Packard Resp. at 5. And the State Defendants all rely on *Peterson*'s holding that *concealed carry* is not protected by the Privileges and Immunities Clause. *See* Walsh Resp. at 11–12; Saldate & Packard Resp. at 7.

None of this responds to Plaintiffs' actual claims, which challenge the combined effect of the laws, not Colorado's concealed-carry restrictions in isolation. For example, Walsh's argument that Hoffman faces no credible threat of prosecution because Colorado allows open carry, Walsh Resp. at 6, misses the mark because Walsh is responsible for prosecuting the option that Denver leaves open (concealed carry). And Saldate and Packard commit a similar error when they assert that Plaintiffs have not met their burden for a facial challenge. *See* Saldate & Packard Resp. at 14 n.8. The question is not whether Colorado or Denver law, standing alone, is facially invalid. Again, Plaintiffs challenge the combined effect of the laws, which results in a flat ban on public carry for ordinary, law-abiding nonresidents. And such a ban is unconstitutional not only as applied to Hoffman, but also facially because, under *Bruen*, there is no application in which it would be valid. In any event, regardless of label, Plaintiffs are entitled to a remedy at least as to Hoffman and similarly situated members. *See Citizens United v. FEC*, 558 U.S. 310, 331 (2010) (explaining that "the distinction between facial and as-applied challenges . . . goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint").

More fundamentally, the State Defendants' insistence that Hoffman's disarmament in Denver "is a matter of local government law," Saldate & Packard Resp. at 5, ignores that Colorado itself designed the regime that disarms him. The State expressly leaves open-carry regulation "to local government." Walsh Resp. at 3 (citing COLO. REV. STAT. § 29-11.7-104). A State "may not

avoid the strictures" of the Constitution by acting "through subdivisions of the State, rather than through the State itself." *Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Nat. Res.*, 504 U.S. 353, 361 (1992). "[W]hat would be unconstitutional if done directly by the State can no more readily be accomplished by a city deriving its authority from the State." *United Bldg. & Constr. Trades Council v. Mayor & Council of Camden*, 465 U.S. 208, 215 (1984).

For all these reasons, the Court can disregard the bulk of Defendants' briefing.

**B. The carry regime leaves Hoffman and similarly situated members of Firearms Policy Coalition with no lawful means to carry in Denver.**

Defendants filed three briefs, yet not one identifies a lawful way for Hoffman or similarly situated nonresidents to carry a handgun in public while in Denver. Their two main arguments—that Hoffman can carry concealed based on his existing permits, and that he could have sought authorization to carry openly—fly in the face of Defendants' own ordinance. And though Defendants cast these arguments in standing terms, the question whether Hoffman is prohibited from carrying a handgun in public is not a standing question but a merits one. Plaintiffs' merits argument is that Colorado and Denver law close off all paths to public carry for certain nonresidents while in Denver, in violation of the Constitution. And "[f]or standing purposes," the Court must "accept as valid the merits of [Plaintiffs'] legal claims." *FEC v. Cruz*, 596 U.S. 289, 298 (2022). In any event, whether framed in terms of standing or the merits, Defendants' arguments fail for all the same reasons.

To carry concealed in Denver, a person must hold "a valid permit" and carry "in conformance with any applicable federal, state, or local law." DENV., COLO., REV. MUN. CODE ("D.R.M.C.") § 38-118(d). Defendants read this provision to allow Hoffman to carry concealed based on his California permit, seemingly recognizing that an out-of-state permit is valid in

Colorado only if issued by the permit holder's state of residence. *See* Denver Resp. at 2, 6, 15; COLO. REV. STAT. § 18-12-213(1)(b)(I). But Defendants ignore a second requirement: an out-of-state permit from the individual's home state is "valid in this state" only if the issuing state "recognizes the validity of" Colorado permits. COLO. REV. STAT. § 18-12-213(1). California, where Hoffman resides, does not. *See Concealed Handgun Permit (CHP) Reciprocity*, COLO. BUREAU OF INVESTIGATION, https://perma.cc/4YYV-PEGM. So Hoffman's California permit, like his other out-of-state permits, is not "valid" in the State of Colorado. COLO. REV. STAT. § 18-12-213(1); D.R.M.C. § 38-118(d). As a result, relying on it to carry a handgun in Denver would not be "in conformance with . . . applicable . . . state . . . law," D.R.M.C. § 38-118(d); COLO. REV. STAT. § 18-12-105(1)(b), (2)(c) (prohibiting concealed carry without "a valid permit"). Defendants do not engage with any of this.

On the concealed-carry issue, Defendant Walsh argues that Hoffman lacks standing because "he has never applied for—and thus never been denied—a concealed-carry license in Colorado." Walsh Resp. at 1. But Walsh himself admits that "[i]n order to obtain a concealed-carry permit, an individual must be a Colorado resident." *Id.* at 3. A plaintiff is not required to make a futile application for a permit for which he is obviously not qualified in order to have standing. *Sporhase v. Nebraska ex rel. Douglas*, 458 U.S. 941, 944 & n.2 (1982). As the Supreme Court has explained, "[i]f an employer should announce his policy of discrimination by a sign reading 'Whites Only' on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365 (1977).

Defendants' argument on open carry fares no better. They say that Hoffman could have "sought" authorization from the city to carry openly. Denver Resp. at 6. But the Denver ordinance provides no mechanism for persons to seek such authorization; it simply states that open carry is not prohibited for persons "[a]cting with valid authorization from the city." D.R.M.C. § 38-118(c)(3). The ordinance identifies no application process, no eligibility criteria, no decisionmaker, no timeline, no fee schedule, and no opportunity for appeal. Nor does any other publicly available source, including the Denver Police Department's website.[2] Defendants try in vain to paper over these omissions with Chief Thomas's declaration, which simply states that the Denver Police Department "would have considered" Hoffman's request "had [he] sought authorization," without explaining how Hoffman was supposed to make that request (or how he was supposed to know where to direct it). Declaration of Chief Ron Thomas ¶ 7, ECF 34-1 ("Thomas Decl."). Tellingly, the declaration fails to identify a *single* example of a person *ever* seeking such authorization, or of the city *ever* granting it. That distinguishes the cases relied on by Defendants, *see* Denver Resp. at 6–7, each of which involved an established and well-defined procedure for seeking a firearm license that the plaintiffs neglected to use.

But even if this illusory exception to Denver's open-carry ban were real, it would be blatantly unconstitutional. A standardless, discretionary authorization regime that—in Defendants' own words—depends on nothing but the "considered" (Thomas Decl. ¶ 7) judgment of government officials is even worse than the "may-issue" regime invalidated in *Bruen*, which at least provided *some* vague standard to guide official discretion. *See* 597 U.S. at 11–13 (invalidating

---

[2] The website addresses only applications for "concealed handgun permits." *Concealed Handgun Permits*, DENVER GOV'T, https://perma.cc/HV8N-E6UN.

licensing regime that required a showing of "special need"). Hoffman was not required to subject himself to a patently unconstitutional "process" before bringing this suit. *Cf. Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 (1969); *Bruen*, 597 U.S. at 38 n.9 (relying on First Amendment precedent, including *Shuttlesworth*, to evaluate licensing schemes under the Second Amendment). Nor was he required to exhaust supposed remedies with the Denver Police Department. *See Patsy v. Bd. of Regents*, 457 U.S. 496, 516 (1982). Defendants also argue that Hoffman could carry a handgun in his car while driving through Denver. *See* Denver Resp. at 1; Saldate & Packard Resp. at 1, 11. *Bruen*, of course, recognized a "general right to publicly carry arms for self-defense," not a right confined to carrying inside an automobile. 597 U.S. at 31.

For these reasons, the Denver Defendants' *Bruen* analysis suffers from the same flaw as the State Defendants' analysis: it proceeds as if Hoffman had a lawful means to carry publicly while in Denver. *See* Denver Resp. at 11–13. Indeed, every case they cite to support restrictions on open carry involved laws that still allowed *concealed* carry. *See id.* at 11–12; *see also, e.g.*, *Frey v. City of New York*, 157 F.4th 118, 139 (2d Cir. 2025) (explaining that New York law "eliminates open carry while permitting concealed carry"); *We the Patriots Inc. v. Doyle*, 2026 WL 592093, at *7 (D. Conn. Mar. 2, 2026) ("Connecticut's open carry prohibition . . . leaves open an avenue of carrying a firearm—concealed carry—available to the public."); *O'Neil v. Neronha*, 2025 WL 2197313, at *3 (D.R.I. Aug. 1, 2025) (explaining that Rhode Island law "regulates Plaintiffs' manner of public carry in that it limits their right to open carry but leaves unaffected their right to concealed carry"). That option is not available to nonresidents like Hoffman. And Defendants identify no historical analogue to justify that result, nor do they engage with the more relevant precedent cited by Plaintiffs invalidating blanket bans on public carry for nonresidents.

*See* Pls.' Mot. for Prelim. Inj. ("PI Mot.") at 10, ECF 13 (collecting cases). Defendants cannot make up for that failure by reserving the right to present purported evidence at a later hearing. *See* Denver Resp. at 12 n.6.

Despite dueling with a strawman, the Denver Defendants still make a mess of the *Bruen* analysis. They say that "Plaintiffs point to no historical analogues inconsistent with Denver's ordinance," that Plaintiffs "do not conduct *Bruen*'s required analogical reasoning," and that Plaintiffs "offer no evidence or other proof at all." *Id.* at 3, 12. But Plaintiffs do not bear the burden to "prove the negative" that some conduct with firearms is protected. Under *Bruen*, the plain text of the Second Amendment establishes that the carrying of firearms is presumptively protected, and if Denver wants to limit it in some way, *it* bears the burden to identify analogous restrictions on the right to keep and bear arms. *Bruen*, 597 U.S. at 24, 33–34. And although Defendants try to flip the burden because of the procedural posture of the case, *see* Denver Resp. at 10–11, the same substantive legal standards apply at the preliminary-injunction stage, *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) (rejecting similar argument and holding that "the burdens at the preliminary injunction stage track the burdens at trial"). Thus, when a plaintiff seeks preliminary relief in a Second Amendment case, the *government's* burden to identify analogous *regulations* does not somehow transform into the *plaintiff's* burden to identify analogous *non-regulation*.

Defendants' claim that Plaintiffs "demand greater ability to carry than" provided under the historical traveler exception is thus irrelevant. Denver Resp. at 13. But it is also wrong. A nonresident like Hoffman who *crosses state lines* is not merely engaged in "the everyday movement through public spaces." *Id.* (citation and quotation marks omitted). As courts have

recognized in enjoining nonresident carry bans like the one challenged here, the principle that underpins our regulatory tradition is that those who travel more than a trivial distance from home—such as those who, like Hoffman, journey *out of state*—enjoy *more* leeway than residents when it comes to the right to public carry. *Hoffman v. Bonta*, 789 F. Supp. 3d 995, 1002–03 (S.D. Cal. 2025); *Cal. Rifle & Pistol Ass'n, Inc. v. L.A. Cnty. Sheriff's Dep't*, 745 F. Supp. 3d 1037, 1065–66 (C.D. Cal. 2024).

In short, a flat ban on public carry for nonresidents is not consistent with "historical public-carry restrictions in the period after the ratification of the Second Amendment in 1791." Denver Resp. at 12 (cleaned up) (quoting *Bruen*, 597 U.S. at 50). The challenged carry regime does not merely "prohibit[] one kind of public carry altogether," *id.*—it prohibits all public carry—and thus there is no historical tradition "analogous" to it, *Bruen*, 597 U.S. at 50.

**C. The carry regime violates the Privileges and Immunities Clause.**

The State Defendants have no response to Plaintiffs' argument that public carry for self-defense falls within the scope of the Privileges and Immunities Clause. *See* PI Mot. at 13. They simply reassert their flawed Second Amendment arguments and, as noted above, invoke *Peterson*'s holding that *concealed carry* is not a privilege protected under Article IV, § 2. *See* Walsh Resp. at 11–12; Saldate & Packard Resp. at 7–8. But *Peterson* itself recognized that public carry more generally may qualify for protection. 707 F.3d at 1216 n.8; *see* PI Mot. at 14.

Nor do the State Defendants identify any substantial reason to discriminate against nonresidents. A State may do so only where nonresidents "constitute a peculiar source of the evil at which the statute is aimed." *Toomer v. Witsell*, 334 U.S. 385, 398 (1948). But the State identifies its main interest as "applying pressure on other states to recognize Colorado's permits." Saldate &

Packard Resp. at 14. That is no basis for imposing "the disabilities of alienage" that the Privileges and Immunities Clause was intended to stamp out. *Paul v. Virginia*, 75 U.S. 168, 180 (1868).

Saldate and Packard also contend that the State has a substantial interest in forbidding firearms in "sensitive-places." Saldate & Packard Resp. at 8 n.4. But if there is "no historical basis . . . to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department," then there is no warrant for doing so to Denver either. *Bruen*, 597 U.S. at 31. Nor are the other areas throughout Colorado where nonresidents like Hoffman cannot carry sensitive places, as evidenced by the fact that persons (including nonresidents) *can* carry in those places so long as they have a valid permit. *See* 18 U.S.C. § 922(q)(2)(A)–(B) (providing that persons may carry within 1,000 feet of a school if they hold a carry license from the state in which the school is located); COLO. REV. STAT. §§ 18-12-105.3(2)(e) (providing that persons with permits may carry in the adjacent parking areas of government buildings), 18-12-105.5(3)(d.5)(II) (same for parking areas of colleges and universities). By denying them permits, Colorado prohibits persons like Hoffman from carrying in these areas simply because they are nonresidents, not because the areas are sensitive places.

**D. Saldate and Packard are not immune under the Eleventh Amendment.**

Saldate and Packard invoke sovereign immunity, but each has the required "connection with the enforcement" of the challenged laws. *Ex parte Young*, 209 U.S. 123, 157 (1908).

Neither Defendant denies enforcing Colorado's prohibition on carrying a concealed handgun without a valid permit, which is a misdemeanor. *See* COLO. REV. STAT. § 18-12-105(1)(b), (2)(c). Saldate directs the Colorado Bureau of Investigation, whose agents have "all the powers of any sheriff or police or other peace officer" and perform duties in "the enforcement of the criminal

laws of this state"—including the prohibition on "knowingly and unlawfully" carrying "a firearm concealed" without a valid permit. *See* Am. Compl. ¶ 13; COLO. REV. STAT. §§ 24-33.5-404, 24-33.5-409, 18-12-105(1)(b), (2)(c). And Packard, as Chief of the Colorado State Patrol, is an officer of the State Patrol and "direct[s] . . . all activities of the" agency and its officers, who may arrest for violations of "any criminal law of" Colorado when probable cause arises in the course of their duties, and who enforce all state laws on state-owned grounds and buildings. *See* Am. Compl. ¶ 14; COLO. REV. STAT. §§ 24-33.5-205, 24-33.5-212(1)(a)(I), (1)(i). In short, these Defendants enforce the State's portion of the challenged carry regime. And neither has disavowed enforcing it against nonresidents like Hoffman. To the contrary, they assert a "strong interest" in enforcing the State's "handgun licensing regime[]" to ensure "public safety." Saldate & Packard Resp. at 13–14. That is a "demonstrated willingness" to enforce. *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007).

Saldate and Packard respond that they have no duty to enforce the residency requirement or the reciprocity provision. *See* COLO. REV. STAT. §§ 18-12-203(1)(a), 18-12-213(1). But those provisions are inextricably tied to Colorado's prohibition on carrying a concealed handgun without a "valid permit," *id.* § 18-12-105(1)(b), (2)(c), because they *define* what constitutes a "valid permit." Or, put differently, those provisions are enforced *through* Section 18-12-105 because they determine who is in violation of it. That is a sufficient connection to enforcement. *See Ex parte Young*, 209 U.S. at 157; *Peterson*, 707 F.3d at 1207 ("Connection to the enforcement of an act may come by way of another state law[.]"); *see also Prairie Band*, 476 F.3d at 828 n.16 (rejecting argument that the challenged reciprocity provision for vehicle registration was unenforceable,

because it was effectively enforced through a separate criminal prohibition on operating unregistered vehicles).[3]

What is more, if the Court ordered Defendants to offer permits to Hoffman and similarly situated FPC members, the Colorado Bureau of Investigation—Saldate's agency—would be responsible for performing the required background checks. *See* COLO. REV. STAT. § 18-12-208. A local sheriff could not process an application without the Bureau's involvement. *See Prairie Band*, 476 F.3d at 828 (holding that "the 'some connection' requirement of *Ex parte Young*" was met because the defendants "assist in giving effect to the law").

Finally, Saldate and Packard can provide the relief sought. *Contra* Saldate & Packard Resp. at 10. If the Court enjoins enforcement of the concealed-carry restrictions for nonresidents, neither Defendant could enforce the concealed-carry restrictions against Hoffman and similarly situated FPC members. And, as noted, if the Court orders that they be allowed to apply for a Colorado permit, the Bureau would perform the required background checks because a sheriff cannot complete an application without it. COLO. REV. STAT. §§ 18-12-205, 18-12-208.

## II. The Carry Regime Causes Irreparable Harm, and the Balance of Equities Supports Preliminary Relief.

When, as here, a plaintiff asserts "an injury in the form of a violated constitutional right," courts "presume that the injury will be irreparable if it exists." *Ortega v. Grisham*, 148 F.4th 1134, 1142 (10th Cir. 2025); *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 806

[3] In *Peterson*, the court held that *Ex parte Young* did not apply because the plaintiff had failed to "cite to any provision of Colorado law establishing a connection between the executive director of the Department of Public Safety and enforcement of Colorado's [concealed-carry] reciprocity regime." 707 F.3d at 1205. Plaintiffs have identified connections for the Defendants here.

(10th Cir. 2019) (explaining that "in the context of constitutional claims, the [constitutional-violation-as-irreparable-injury] principle collapses the first and second preliminary-injunction factors, equating likelihood of success on the merits with a demonstration of irreparable injury"). "What makes an injury 'irreparable' is the inadequacy of, and the difficulty of calculating, a monetary remedy after a full trial." *Free the Nipple-Fort Collins*, 916 F.3d at 806. Despite Defendants' effort to treat Second Amendment violations differently, "[a]ny deprivation of *any* constitutional right fits that bill." *Id.* (emphasis added). Accordingly, "Plaintiffs need to show no further irreparable harm." *Id.*

Likewise, "[w]hen a constitutional right hangs in the balance . . ., even a temporary loss usually trumps any harm to the defendant." *Id.* (cleaned up). After all, governments have "no interest in keeping an unconstitutional law on the books." *Id.*; *see also id.* at 807 (reasoning that it is "always in the public interest to prevent the violation of a party's constitutional rights" (cleaned up)). For these reasons, Plaintiffs' substantial likelihood of success on the merits controls the analysis on every preliminary-injunction factor.

These are basic principles of equitable relief, so Defendants are wrong to assert that Plaintiffs somehow "default[ed]" by failing to offer *other* reasons for why the balance tips in their favor. Walsh Resp. at 13; *see* Saldate & Packard Resp. at 10 (accusing Plaintiffs of "ask[ing] this Court to dispense with three-quarters of the *Winter* test"). But if more were needed, Defendants' asserted interests pale in comparison. They claim an interest in "maintain[ing] public safety in dense urban environments," Denver Resp. at 14, but they already allow both residents and nonresidents from states with reciprocity to carry firearms in Denver. Moreover, they offer no details on the alleged "administrative burden" of respecting Plaintiffs' constitutionally protected rights, which would

simply require applying existing laws and procedures to a narrow class of additional persons. Saldate & Packard Resp. at 13. And Plaintiffs' interest in exercising those rights far outweighs "the State's important interest in applying pressure on other states to recognize Colorado's permits." *Id.* at 14.

Nor is there merit to Defendants' accusation that the alleged "delay" in seeking preliminary relief undercuts a finding of irreparable harm. Delay in seeking preliminary relief "is only one factor to be considered among others, and there is no categorical rule that delay bars the issuance of any injunction." *Fish v. Kobach*, 840 F.3d 710, 753 (10th Cir. 2016) (citation omitted). "The question instead is whether the delay was reasonable, was not a decision by the party to sit on its rights, and did not prejudice the opposing party." *Id.* (cleaned up).

Here, Defendants focus "only [on] the length of the [alleged] delay and fail[] to show how that delay prejudiced [them]." *Id.* "This failure alone is sufficient for [the Court] to reject [their] delay rationale." *Id.*; *see RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1212 (10th Cir. 2009) (affirming finding of irreparable harm because, among other things, the defendant "has not argued that the delay in any way disadvantaged its interests"); *Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1544 (10th Cir. 1994) (affirming finding of irreparable harm because "defendants have not claimed that they are somehow disadvantaged because of the delay").

What is more, any alleged delay was reasonable. For one, the legal landscape for Second Amendment claims has changed rapidly in recent years, starting with *Bruen* in 2022 and continuing through *Wolford v. Lopez*, 609 U.S. 185 (2026), this past summer. The claims asserted here depend heavily on those recent developments. For another, the nature of the challenged carry regime

makes lawsuits inherently less likely, because the carry ban affects *only* nonresidents—and thus persons who are not subject to it on a daily basis.

### III. The Court Should Grant Relief to Hoffman and Firearms Policy Coalition's Similarly Situated Members.

Plaintiffs seek preliminary relief for Hoffman and FPC's similarly situated members. Plaintiffs respectfully request that the Court enjoin Defendants from enforcing the unconstitutional carry regime against Hoffman and FPC's similarly situated members, order that they be permitted to apply for a Colorado concealed-carry license on the same terms as residents, and order that the State Defendants recognize as valid their out-of-state permits. Providing the ability to obtain a Colorado-issued license is necessary because nonresidents would otherwise be barred from carrying within 1,000 feet of any school in the State. *See* 18 U.S.C. § 922(q)(2)(A)–(B). Any valid permit—whether issued by Colorado or by a person's home state—would allow that person to carry publicly in Denver and in the parking areas of public universities and certain government buildings. *See* COLO. REV. STAT. §§ 18-12-105.3(2)(e), 18-12-105.5(3)(d.5)(II).

Defendants respond that, even if the Court ordered that Hoffman be allowed to apply for a Colorado permit, there is not enough time for the permit process to run its course before Hoffman's January trip. *See* Saldate & Packard Resp. at 12 n.6. But Colorado already has a process for obtaining temporary emergency permits on an expedited basis when the applicant is in immediate danger, *see* COLO. REV. STAT. § 18-12-209, and Defendants give no reason why a similar process could not be offered to Hoffman when his delay in being able to acquire a permit was occasioned by their unconstitutional refusal to consider out-of-state applications. Defendants' suggestion that Hoffman has not completed Colorado's training requirement, *see* Saldate & Packard Resp. at 14, changes nothing—Hoffman has sworn that he is willing and able to satisfy every requirement for

a permit other than residency, *see* Declaration of Gene Hoffman ¶ 11, ECF 13-1. Moreover, even without a Colorado permit, the rest of the requested relief—enjoining enforcement of the carry regime against Hoffman, and ordering that Colorado recognize as valid his California permit—would enable him to publicly carry in most places during his upcoming trip.

Defendants also argue that the Court cannot extend relief to FPC's members because Plaintiffs have not identified any member other than Hoffman. Denver Resp. at 14–15; Walsh Resp. at 13; Saldate & Packard Resp. at 14. That argument conflates standing with remedy. To establish standing, an association need only identify one member who would have standing in his own right. *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 550 (10th Cir. 2016). Hoffman is that member, as Defendants acknowledge. *See* Denver Resp. at 8 (FPC's standing "turns entirely on the standing of Hoffman"). Once that showing is made, nothing requires an association to name every member it represents. Quite the opposite in fact—such information is shielded from disclosure by the First Amendment. *See Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021). When an association seeks "a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Warth v. Seldin*, 422 U.S. 490, 515 (1975). And members of FPC who wish to take advantage of injunctive relief in their favor could simply identify <u>*themselves*</u> as members to the government.

Courts routinely enter exactly this relief, including in Second Amendment challenges brought after the Supreme Court's decision in *Trump v. CASA*, 606 U.S. 831 (2025). Most on point, in FPC's challenge to California's nonresident carry ban, the court permanently enjoined enforcement of the residency requirement "as to CCW applications submitted by Plaintiff Firearms

Policy Coalition's members who are not residents of California, including the named Individual Plaintiffs." Permanent Inj., *Hoffman v. Bonta*, No. 3:24-cv-664-CAB-MMP (S.D. Cal. Aug. 21, 2025), ECF 27 at 1. The order did not require FPC to name its members. Likewise, in *Firearms Policy Coalition v. Bondi*, the court enjoined enforcement of the federal post-office carry ban against the individual plaintiffs and the members of FPC and the Second Amendment Foundation, 805 F. Supp. 3d 721, 733 (N.D. Tex. 2025), and later rejected the Government's *CASA*-based request to narrow that relief to identified members who were part of the organizations at the time the suit was filed, *see* Order, No. 4:24-cv-00565-O (N.D. Tex. Mar. 17, 2026), ECF 50; *see also Cal. Rifle & Pistol Ass'n, Inc. v. L.A. Cnty. Sheriff's Dep't*, No. 2:23-cv-10169-SPG (C.D. Cal. Jan. 22, 2025), ECF 81 at 2 (preliminary injunction extending to members of four plaintiff organizations seeking carry licenses who, "upon proof of such membership, [we]re entitled under th[e] Order to apply for a California concealed handgun license").

*CASA* does not hold otherwise. *CASA* forbids injunctions that protect nonparties, but it reaffirmed that courts may grant "complete relief to each plaintiff with standing to sue." *CASA*, 606 U.S. at 861. FPC is a plaintiff with standing, and it sues on behalf of its members. Indeed, Defendants themselves hold up *Bondi* as a model of properly limited relief running to the "associational plaintiff and its members." Denver Resp. at 14. That is precisely the relief requested here.

Nor must FPC identify each protected member by name for purposes of administrability. *Contra id.* at 15. The Court could simply extend the injunction to persons who (1) can demonstrate that they are members of FPC; (2) reside in a state whose carry permits Colorado does not recognize; and (3) hold a valid carry permit issued by their state of residence. That is the same

mechanism California adopted to implement the *Hoffman v. Bonta* injunction: nonresident applicants simply had to "provide proof of membership in the FPC (e.g., membership card, membership receipt or letter) to confirm that their application falls within the Hoffman Order." *Guidance to CCW Licensing Authorities Regarding CCW Applications from Nonresident Firearms Policy Coalition Members Pursuant to the Permanent Injunction in* Hoffman et al. v. Bonta, CAL. DEP'T OF JUSTICE, DIV. OF LAW ENF'T, Info. Bull. No. 2025-DLE-13, at 2 (Sept. 12, 2025), https://perma.cc/2HYA-AY7J.

In all events, the Court should at least grant preliminary relief to Hoffman, who, without it, will plainly be unable to exercise his right to bear arms when he travels to Denver in January.

## CONCLUSION

The Court should grant Plaintiffs' motion for a preliminary injunction.

Dated: November 25, 2026

Respectfully submitted,

*/s/ David H. Thompson*

David H. Thompson
Peter A. Patterson
William V. Bergstrom
Riley W. Walters
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Telephone: (202) 220-9600
Facsimile: (202) 220-9601
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com
rwalters@cooperkirk.com

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 25th day of November, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which effectuated service on all counsel of record.

*/s/ David H. Thompson*
David H. Thompson

*Counsel for Plaintiffs*